# CHARLESTON.

CITY OF HUNTINGTON *et al. v.* PUBLIC SERVICE COMMISSION

(No. 5358.)

Submitted May 6, 1925.   Decided April 13, 1926.

1.  TELEGRAPHS AND TELEPHONES—*Telephone Company is Entitled to Fair Return on Present Fair Value of Property Used in Public Service.*

    A Telephone Company is entitled to a fair return upon the present fair value of its property used and useful in the public service.   (p. 380.)

    (Telegraphs and Telephones, 37 Cyc. p. 1632.)

2.  SAME—*Inclusion in Rate Value of Telephone Company's Property of Cost of Property and Franchises of Competing Company Held Proper, Although Price Paid Exceeded Value.*

    Adopting the actual cost of the property of the Telephone Company as the fair value for rate making, the Public Service Commission properly included therein, as a part thereof, under the facts and circumstances of this case, the entire cost to the Telephone Company of the physical property and franchise rights of an independent competing company purchased by it to afford the public better and cheaper service, although the price paid was in excess of the value of the physical property so acquired.   (p. 382.)

    (WOODS, JUDGE, dissents.)

    (Telegraphs and Telephones, 27 Cyc. p. 1632.)

3.  PUBLIC SERVICE COMMISSIONS—*Orders of Public Service Commission Fixing Rates Are Not Subject to Judicial Interferrence, Unless Beyond Its Constitutional or Statutory Power, Based on Mistake of Law. or Rate is So Low As to Be Confiscatory and Take Property Without Due Process of Law, or Unless Commission Fixes Rates Contrary to Evidence, or Without Evidence, or Violates Rule that Substance and Not Shadow Determines Validity of Exercise of Power.*

    Orders of the Public Service Commission fixing rates are not subject to judicial interference, unless (1) beyond the power which it could constitutionally exercise; or (2) beyond its statutory power; or (3) based upon a mistake of law; or (4) the rate is so low as to be confiscatory and in violation

of the constitutional prohibition against taking property without due process of law; or (5) if the Commission acted so arbitrarily and unjustly as to fix rates contrary to evidence, or without evidence to support it; or (6) if the authority therein involved has been exercised in such an unreasonable manner as to cause it to be within the elementary rule that the substance, and not the shadow, determines the validity of the exercise of the power.   (p. 392.)

(Telegraphs and Telephones, 37 Cyc. p. 1632.)

(NOTE:  Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

The Chesapeake & Potomac Telephone Company filed tariffs increasing public rates and charges with the Public Service Commission, which entered an order allowing proposed rates, cancelling proposed local exchange rates, and granting the company authority to re-classify its exchanges.   The city of Huntington and others petition for a suspension, and the Telephone Company presents cross-assignments of error.

*Modified and affirmed.*

*C. W. Strickling, Harry Scherr, Carl O. Schmidt, Albert J. Kern, Fred L. Shinn* and *H. D. Rummel,* for petitioners.

*Frank W. Nesbitt, George R. C. Wiles, Dozier A. De Vane, Nesbitt, Goodwin & Nesbitt,* and *MacCorkle, Clark & MacCorkle,* for respondent Telephone Co.

*Roscoe F. Walter* and *W. W. Smith,* amici curiæ.

LITZ, PRESIDENT:

On January 25, 1924, Chesapeake & Potomac Telephone Company, a public utility, filed with the Public Service Commission tariffs increasing its rates and charges, to become effective March 1, 1924.   During an investigation to determine the reasonableness of the proposed rates, which followed, extensive hearings were had, culminating in an order by the Commission, allowing the proposed private branch exchange, and interstate toll, rates; cancelling the proposed local exchange rates and granting the utility authority to re-classify its exchanges, in accordance with an established basis of classification, whenever justified by change in the number of telephones of any local exchange area.

We are asked to review the order of the Commission, upon the application of the protesting patrons and cross-assignments of error by the Telephone Company. The controversy presents the following questions:

(a)  The present fair value of the applicant's property for rate making purposes;

(b)  Whether payment by the applicant of 4½% of its gross revenues to the American Telephone & Telegraph Company should be partly charged to capital investment;

(c)  The amount of depreciation properly chargeable to operating expenses;

(d)  The proper rate of return; and

(e)  The automatic advancement in classification of exchanges, and consequent automatic increase in rates, without full hearing by the Commission.

Discussion of these matters will proceed in the order stated.

The Commission found that the fair value of the applicant's property devoted to public use as of December 31, 1923, was $15,000,000.00. This valuation includes the following items:

| | |
|---|---|
| The physical property | $12,868,860.93 |
| "Intangibles" or "Intangible Capital", treated as going concern value | 1,032,277.35 |
| "Additional" going concern value | 600,000.00 |
| Working capital | 500,000.00 |

The patrons submit to the finding of the Commission on the value of the physical property; but the Telephone Company insists that the amount was determined without proper consideration of the evidence relating to reproduction cost, and is, for that reason, too low. Three engineers were introduced to prove the cost of reproduction new, less depreciation: W. F. Sloan and C. A. Robinson, by the Telephone Company, and W. J. Hagenah by the protestants, whose estimates were $15,327,368.00, $14,682,412.00, and $13,001,664.00 respectively. The actual cost shown by the books of the Company, without deduction for depreciation, is $12,868,860.93. These figures, adopted by the Commission as fairly repre-

senting the value of the property, not only accord with the evidence of the witness Hagenah on the cost of reproduction, but also find support in the fact that the greater portion of the equipment was installed during a period of high prices. Besides, the cost of reproduction, new, less depreciation, is to be accepted merely as an element and not as the standard of value.

In *Georgia Railway & Power Co.* v. *Railroad Commission,* 262 U. S. 625, it is said:

> "This case is unlike *Missouri ex rel. Southwestern Bell Telephone Company* v. *Public Service Commission,* 262 U. S. 276, 43 Sup. Ct. Rep. 544, decided May 21, 1923. Here the Commission gave careful consideration to the cost of reproduction, but it refused to adopt reproduction cost as the measure of value. It declared that the exercise of a reasonable judgment as to the 'present fair value' required some consideration of reproduction costs as well as of the original costs, but that 'present fair value' is not synonymous with 'present replacement cost', particularly under abnormal conditions. That part of the rule which declares the utility entitled to the benefit of increases in the value of the property was, however, specifically applied in the allowance of $125,000.00 made by the commission to represent the appreciation in the value of the land owned. The lower court recognized that it must exercise an independent judgment in passing upon the evidence and it gave careful consideration to replacement cost. But it likewise held that there was no rule which required that in valuing the physical property there must be 'slavish adherence to cost of reproduction less depreciation'. It discussed the fact that since 1914 large sums had been expended annually on the plant; that part of this additional construction had been done at prices higher than those which had prevailed at the time of the rate hearing; and it concluded that 'averaging results and remembering that values are * * * matters of opinion * * * no constitutional wrong clearly appears'.

> "The refusal of the Commission and of the lower court to hold that, for rate-making purposes,

>the physical properties of a utility must be valued at the replacement cost less depreciation was clearly correct."

Furthermore, the Commission allowed, as part of the rate base, the "intangibles" or "intangible capital", hereinafter considered. We can not say, under the circumstances, that the finding of the Commission was either against the weight of the evidence or without evidence to support it. Findings of fact by the Public Service Commission will not be reviewed, unless it has acted so arbitrarily and unjustly as to fix rates contrary to the evidence, or without evidence to support them. *B. & O. Ry. Co.* v. *Public Service Commission*, 99 W. Va. 670, 129 S. E. 131; *Pittsburgh & West Virginia Gas Co.* v. *Public Service Commission*, decided recently by this Court.

The protestants vigorously except to the action of the Commission in treating the "intangibles" or "intangible capital", amounting to $1,032,277.35, as part of the present fair value of the property devoted to public service.

The applicant is one of the numerous associated companies composing the Bell Telephone System, which is virtually owned and controlled by the American Telephone & Telegraph Company. After organizing in 1916, it acquired the operating properties and franchises of two Bell Companies and an independent competing company, the Consolidated Telephone Company of West Virginia. The book value of the tangible property of the independent company was $1,232,-806.24. The difference between this amount and the purchase price of $2,318,189.64 represented the intangible value of the business, which, under the name of "intangibles" or "intangible capital", the Commission has treated as part of going value. The patrons contend that notwithstanding the purchase was in good faith and is beneficial to public interest, the applicant is not entitled to earn on the investment beyond the fair value of the physical property so acquired.

It may be assumed that the mere transfer of property used in public service at a price in excess of its fair value would not justify an increase in rates. But the purpose of the applicant in acquiring the physical property and franchise

rights of the competing company was to afford the public cheaper and better service. With this object in view, there is no suggestion that the price paid was excessive. A utility often pays in the purchase of equipment added cost for patent rights, when less efficient machinery could be secured at lower prices. It may be compelled also in times of emergency to pay excessive prices for ordinary supplies. Yet there is no doubt of its right to full allowance for such outlays. Under this principle, since the Commission has adopted the book cost as the fair value of the property used and useful in the public service, we think the item under consideration was properly included in the rate base.

The effect of the purchase by the applicant of the property and business of the independent utility was to eliminate the unnecessary duplication of investment and expense of maintaining and operating two competing systems, where one will render more adequate service than both. The universal objection to competition of municipal public utility systems is the economic one of the unnecessary duplication of the investment and the expense of maintenance and operation of two parallel systems where one could render adequate service at practically one-half the cost of installation, maintenance and even of operation in at least some cases where the cost of the material is only nominal; as for example, the furnishing of a water supply, where there is practically an unlimited free source of supply available. Nor is this economic objection overcome or even met by the legal theory which until recently prevailed as the sole controlling reason for the supposed advantages arising from competitive conditions as the proper means of regulating the service rendered or the rate charged for it, for it is now very generally recognized that in case of municipal public utilities which are natural monopolies, competition is at once an expensive and absolutely ineffective ultimate method of regulating either the rates or the service of the modern municipal public utility.

The furnishing of telephone service may be distinguished from providing that of any other municipal public utility, and by virtue of this fact it is governed by laws, some of which are peculiar to itself. A customer of a municipal public

utility providing water, gas, light, heat or power may as a general rule be furnished with adequate and complete service by the particular municipal public utility with which he contracts, although there may be a duplication of such service available by the existence of another similar municipal public utility rendering the same kind of service alongside and parallel with the competing company with which the particular customer has contracted for his service. In the case of the municipal public utility furnishing telephone service, however, in a field where a competing company is also providing such service, neither company alone and independent of the other can furnish adequate or complete service unless, which practically never occurs, both companies have identically the same list of customers, except where the competing companies make physical connection of their equipment by the use of a common switchboard, which gives and receives messages from all customers of either company.

In its treatment of the subject the Commission says:

"The Telephone Company acquired its three original properties at a time when prices were fairly high. It is fair to assume that it paid the fair market value as of that date for said property. Each of said properties was a going concern and from the amount of intangibles in said purchase price it must have paid for the going concern value of each of the said properties. The consolidation of these three properties and the building up of one system in this State into an efficient operating plant has resulted in additional going concern value on which the Telephone Company is entitled to a fair return. We are of opinion to fix this additional going concern value in the sum of $600,000.00."

It is unnecessary to determine whether the Commission improperly considered the "intangibles" or "intangible capital" as a part of going value. We would not be warranted in revising its allowance of $1,600,000.00 for the "intangibles" and going value. The expert witness relied on by the patrons fixes the going value alone at $1,300,000.00. The

witnesses for the Company make it much larger. The evidence for the utility upon this issue is predicated upon the estimated cost of, and the losses sustained while, establishing the business. It is urged on behalf of the patrons that going value can be established only by evidence of the actual cost of organizing the business, and that neither the estimated cost thereof nor the loss sustained by the utility while developing the business can be considered for this purpose.

In the case of *Des Moines Gas Co.* v. *Des Moines*, 238 U. S. 153, it is said:

> "Going value or going concern value, that is, the value which inheres in a plant where its business is established, as distinguished from one which has yet to establish its business, has been the subject of much discussion in rate making cases before the courts and commissions. * * * That there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced, is self-evident. This element of value is a property right and should be considered in determining the value of property, from which the owner has the right to make a fair return when the same is privately owned, although dedicated to public use. * * * Included in going value as usually reckoned is the investment necessary to organizing and establishing the business which is not embraced in the value of its actual physical property."

It is everywhere conceded that a utility with a good business is worth more than one without; and the rule has finally become established that an allowance should, therefore, be made for this intangible; but there is great lack of harmony as to the proper method of ascertaining that value.

Having concluded that the Telephone Company is entitled to earn on its entire investment, and the protesting patrons conceding the propriety of an allowance of at least $600,000.00 for going value, it is unnecessary to attempt an analysis of the great mass of conflicting cases relating to the ascertainment of going value.

In the expenses of operation is included an item of expense representing the payment to the American Telephone & Telegraph Company for services and telephone instruments of that company furnished to the applicant company under a contract between them commonly known as the license agreement. According to the terms of this agreement the parent company is paid by the applicant 4½ per cent. of its gross revenue, in consideration of which the former provides for the latter:

1.   Telephone transmitters and receivers, with induction coils, including a surplus supply to cover current demands;

2.   Rights under all patents owned or controlled by the American Telephone and Telegraph Company covering the use of telephone devices, apparatus, methods and systems;

3.   The right to use all standardized new and improved apparatus and methods developed through research and experimental work;

4.   A guarantee of freedom from royalties, damages and expenses, on account of patents arising out of recommended uses of apparatus, ·methods and systems;

5.   An organization to prosecute continuously the fundamental work of research and investigation to the end that safety, economy and efficiency in the business may be promoted;

6.   Advice and assistance in general engineering, plant, traffic, operating, commercial, accounting, patent, legal, administrative, and other matters involved in the efficient, economical and successful conduct of the business;

7.   Advice and assistance in the financing necessary in order to develop and enlarge its plant;

8.   Assistance, co-operation and support in promoting the health and welfare of employees, including the Plan for Employees' Pensions, Disability Benefits and Death Benefits, with a provision

for guaranteeing the integrity of the funds provided by the associated companies for this purpose;

9.   The right to extend to its connecting companies, for the general betterment of the service, the benefits of such engineering and other technical advice and information as the licensee may have received from the American Telephone and Telegraph Company.''

The protesting patrons do not challenge the validity of the contract, but insist that a substantial part of the consideration paid by the applicant should be charged to investment.  Considering the question, in the case of *Missouri ex rel S. W. Bell T. Co.* v. *Public Service Commission,* 262 U. S. 276, the Supreme Court, speaking through Justice McReynolds, said:

''The important item of expense disallowed by the Commission—$174,048.60—is 55 per cent. of the 4½ per cent. of gross revenues paid by plaintiff in error to the American Telephone & Telegraph Company as rents for receivers, transmitters, induction coils, etc., and for licenses and services under the customary form of contract between the latter company and its subsidiaries.  Four and one-half per cent. is the ordinary charge paid voluntarily by local companies of the general system. There is nothing to indicate bad faith.  So far as appears, plaintiff in error's board of directors has exercised a proper discretion about this matter requiring business judgment.  It must never be forgotten that while the State may regulate, with a view to enforcing reasonable rates and charges, it is not the owner of the property of public utility companies, and is not clothed with the general power of management incident to ownership.  The applicable general rule is well expressed in *State Public Utilities Commission ex rel. Springfield* v. *Springfield Gas & E. Co.,* 291 Ill. 209, 234, P. U. R. 1920C, 640, 125 U. E. 891:

'' 'The commission is not the financial manager of the corporation, and it is not empowered to substitute its judgment for that of the directors of

the corporation; nor can it ignore items charged by the utility as operating expenses unless there is an abuse of discretion in that regard by the corporate officers.' "

This Court should adhere to that ruling.

The Commission decided that $550,000.00 annually, to be charged to operating expenses, was a proper allowance for a depreciation reserve fund to provide for renewals and amortization. The protesting patrons assert that the amount is too great, while the Telephone Company, with as much emphasis, insists that it should be $656,631.43. December 31, 1923, the fund was $1,891,314.02, while the observed or actual depreciation amounted to $1,642,000.00.

To support its contention the Telephone Company relies chiefly upon Section 20 of the Interstate Commerce Act authorizing the Interstate Commerce Commission to require annual reports from all common carriers, under a uniform system of accounting, presenting in detail the status of their business. Among the rules prescribed by the Commission, for the guidance of telephone companies in making annual reports, pursuant to the Act, those relating to depreciation of the plant and equipment follow:

"Telephone companies should include in operating expenses depreciation charges for the purpose of creating proper and adequate reserves to cover the expenses of depreciation currently accruing in the tangible fixed capital. By expense of depreciation is meant:

(a) The losses suffered through the current lessening in value of tangible property from wear and tear (not covered by current repairs).

(b) Obsolescence or inadequacy resulting from age, physical change, or supersession by reason of new inventions and discoveries, changes in popular demand, or public requirements, and

(c) Losses suffered through destruction of property by extraordinary casualties.

The amount charged as expense of depreciation should be based upon rules determined by the

accounting company. Such rules may be derived from a consideration of the company's history and experience. Companies should be prepared to furnish the Commission, upon demand, the rules and a sworn statement of the facts, expert opinions, and estimates upon which they are based.

The estimate for depreciation of physical property should take into account:

(a) The gradual deterioration and ultimate retirement of units of property which may be satisfactorily individualized, such as buildings, machines, valuable instruments, etc., to the end that by the time such units of property go out of service there shall have been accumulated a reserve equal to the original money cost of such property plus expenses incident to retirement less the value of any salvage.

(b) The depreciation accruing in property which can not be readily individualized, such as pole lines, wires, cables, or other continuous structures, where expenditures for repairs or replacements of individual parts ordinarily are not actually made until the later years of the life in service of such property, and when made may, therefore, be classed as extraordinary repairs.

The rate of depreciation should be fixed so as to distribute, as nearly as may be, evenly throughout the life of the depreciating property the burden of repairs and the cost of capital consumed in operations during a given month or year, and should be based upon the average life of the units comprised in the respective classes of property.

The amount estimated to cover the expense of depreciation of fixed capital should be charged monthly to Account No. 608, 'Depreciation of Plant and Equipment' (or to the appropriate clearing account or accounts), and concurrently credited to Account No. 102, 'Reserve for Accrued Depreciation—Cr.'

Account No. 413, 'Realized Depreciation Not Covered by Reserves', is provided in the Corporate Surplus or Deficit Account for charges for realized depreciation on tangible fixed capital retired when

such depreciation occurred prior to the establishment of Account No. 102, 'Reserve for Accrued Depreciation—Cr.', or has not been provided for by credits to that account.''

The last amendment to the Interstate Commerce Act, effective February 28, 1920, Paragraph 5, Section 20, provides:

''The Commission shall, as soon as practicable, prescribe, for carriers subject to this Act, the classes of property for which depreciation charges may properly be included under operating expenses, and the percentages of depreciation which shall be charged with respect to each of such classes of property, classifying the carriers as it may deem proper for this purpose. The Commission may, when it deems necessary, modify the classes and percentages so prescribed. The carriers subject to this Act shall not charge to operating expenses any depreciation charges on classes of property other than those prescribed by the Commission, or charge with respect to any class of property a percentage of depreciation other than that prescribed therefor by the Commission. No such carrier shall in any case include in any form under its operating or other expenses any depreciation or other charge or expenditure included elsewhere as a depreciation charge or otherwise under its operating or other expenses.''

March 18, 1920, the Interstate Commerce Commission addressed a communication to all carriers concerned, after quoting the above amendment, stating:

''Information received by the Commission indicates the existence of doubt as to the propriety of carriers making any charges to operating expenses with respect to depreciation prior to such time as the Commission shall prescribe the specific percentages of depreciation which shall be charged.

''The purpose of this circular is to dispel any such doubt, as may exist in the minds of accounting officers.

"Until the ·Commission shall otherwise order, all carriers subject to the Act to regulate commerce should continue to observe the requirements respecting the accounting for depreciation which are embodied in the effective accounting classification prescribed by the Commission for the respective classes of carriers."

The Interstate Commerce Commission has never acted, under the amendment, by prescribing for carriers subject to the Act the classes of property for which depreciation charges properly may be included under operating expenses, and the *percentages* of depreciation which shall be charged with respect to each of such classes of property, yet the Telephone Company insists that the amount for depreciation reserve fixed by it at 5.5 per centum, in its annual reports to the Interstate Commerce Commission in accordance with the uniform system of accounting, must be accepted by the State Commission without investigation.

The answer to this contention is that it was not the purpose or effect of the uniform system of accounting to place within the power of the utility the right to fix rates. "Congress, in Sec. 20 (Interstate Commerce Act), has authorized the Commission to inquire as to the business which the carrier does and to require the keeping of uniform accounts, in order that the Commission may know just how the business is carried on, with a view to regulating that which is confessedly within its power". *Interstate Commerce Commission* v. *Goodrich Transit Company,* 224 U. S. 194.

The allowance authorized by the Commission is equal to 4½ per cent. of the depreciable property. The utility asks for 5.5 per cent., while the patrons insist that the rate should not exceed 3.84 per cent. The difference between the applicant and the protestants is due largely to their respective theories for the treatment of the fund. The former contends that the fund belongs to it, to do with as it may, as payment for the property consumed in the service; while the latter insists that the accumulation should be held in reserve as a trust fund until it is needed to replace the worn out, obsolete and destroyed parts, and that the Company should pay interest

thereon pending such application. The first theory is known as the "straight line method"; the second the "sinking fund method". Mr. Spurr, in his admirable work, Guiding Principles of Public Service Regulation, Vol. 11, p. 332, gives the opinion that one or the other of the two methods should apply, depending upon the facts of the particular case:

> "Whether interest should be so paid and added to the depreciation fund depends upon the amount at which the rate base has been fixed. Assume, for example, that the original investment were $100,000, and that there has been no change in values; that the amount in the depreciation fund is $25,000, and that accrued depreciation amounts to $25,000. If the sum of $25,000 is now taken out of the depreciation fund and invested in new plant, the company's investment is still $100,000, just as it was in the beginning. This value is made up as follows: $75,000, depreciated value of old plant plus $25,000 value of new plant. If the return is now to be based on $100,000, the company would be under no obligation to pay anything into the depreciation fund in the way of interest or return because it would be getting no more than a reasonable return on its investment. If, however, the rate base were fixed at $125,000, accrued depreciation not being taken into consideration, the company would be under obligation to pay interest on the $25,000 withdrawn from the depreciation fund."

The orders of the Public Service Commission fixing rates are not subject to judicial interference, unless (1) beyond the power which it can constitutionally exercise; or (2) beyond its statutory power; or (3) based upon a mistake of law; or (4) the rate is so low as to be confiscatory and in violation of the constitutional prohibition against taking property without due process of law; or (5) if the Commission acted so arbitrarily and unjustly as to fix rates contrary to evidence, or without evidence to support it; or (6) if the authority therein involved has been exercised in such an unreasonable manner as to cause it to be within the elementary rule that the substance, and not the shadow, determines the

validity of the exercise of the power. *United Fuel Gas Co.* v. *Public Service Commission*, 73 W. Va. 571. With the history of the Company before the Commission this Court would not be justified, under the rules stated, to hold that the allowance for depreciation reserve is insufficient or excessive.

The Utility complains of the rate of return fixed by the Commission at seven per cent. *In re Bluefield Water Works etc. Co.* v. *Public Service Commission*, 262 U. S. 679, holds:

> "What annual rate will constitute just compensation depends upon many circumstances and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public, equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings, which are attended by corresponding risks and uncertainties. * * * The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate under an efficient and economical management to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties."

The applicant relies upon the testimony of two West Virginia bankers, presenting their opinions as to the rate of profit an ordinary business conducted in this State should produce to command necessary credit and accumulate a proper surplus after the payment of interest and other expenses; and the evidence of an employee of the American Telephone & Telegraph Company introducing a list of public utility bond and note issues, showing the character, amount, price, and interest rate of each issue. Each of these witnesses also expressed the opinion that the Telephone Company should receive a return of at least 8 per cent. William J. Hagenah, a witness for the patrons, in the course of his examination states:

> "What constitutes a reasonable return for this company is not indicated by the cost of capital to a

large number of corporations issuing securities of a wholly different character and under conditions different from those which apply at this time to the company under investigation. The problem in this instance is to ascertain the cost of capital to this company, assuming the existence of such a well-balanced and scientific capital structure as the authorities of West Virginia have a right to expect from a utility of this size and character and under the supervision of a parent company that is the largest and most prosperous public utility holding company in the history of the industry, namely, the American Telephone & Telegraph Company. Since the local operating company is required by contract to pay to the parent company each year a large sum of money for managerial and other services, including aid in financing, the utility should receive benefits consistent with such payment. The cost of capital for the company in question under this strong financial guardianship can best be determined from the cost of capital to other and similar subsidiaries of this same parent company.''

As evidence of the financial soundness of the Bell System and its ability to obtain cheap money, an excerpt from a speech of the president of the Bell Telephone Securities Company delivered before the Investment Bankers Association of America, October 19, 1923, was introduced by the protestants, reading:

''The American Telephone and Telegraph Company is the parent company of the Bell System, in which there are twenty-six associated companies. It owns directly or indirectly over ninety per cent. of the capital stock of the associated companies. It owns also nearly all the voting stock of the Western Electric Company. It owns directly and operates the long distance lines and owns the telephone instruments used by the associated companies; and it owns, controls, or is licensed under six thousand United States letters patent and applications.

''The book cost of the plant of the Bell System, —not its value, which is higher,—is approximately

$1,900,000,000; and its surplus and reserves are over $630,000,000.

''The American Company and its associated companies have always pursued a sound and conservative business policy. They have always retained a considerable part of their earnings in the business; in 1922, the associated companies retained twenty per cent. of their net income.     •

''These associated companies earned in 1922 5.6 per cent. on the book cost of their plant. They would have had to earn only 4.7 per cent. to make it possible for the American Telephone Company to pay its 9 per cent. dividend; and in that year the American Telephone Company earned 11.14 per cent., which was greater than the average earnings for ten years; and its earnings are now satisfactory on its increased capital.

''For ten years the American Telephone Company has earned its interest charges more than four and one-half times; and this year (1923) it is earning them more times than that.

''It has had an unbroken dividend record for over forty years. It has never passed a dividend; and its record for prompt payment of interest and principal of its indebtedness is almost unique.''

These facts unquestionably show that the business undertaking of the applicant Company can not be compared to the average business investments in West Virginia, with reference to corresponding risks and uncertainties. Very few, if any, of such businesses have financial support and managerial supervision comparable to that furnished the applicant by the parent company, through its vast resources and highly developed organization; and under the license agreement the cost of this service is borne by the public.

The Federal Income Tax of the utility is paid by the patrons as an item of expense. This relieves the stockholders from the payment of Income Tax on the dividends they receive from the corporation. *Galveston Elec. Co.* v. *Galveston,* 258 U. S. 388, 66 L. Ed. 678, P. U. R. 1922D 159, 42 S. C. R. 351.

In view of the applicant's unique financial and managerial resources, the inaptness of its evidence to establish a greater

rate than 7 per cent., and the further fact that the stockholders are relieved through the patrons from the payment of income tax on their dividends, it cannot be said that the Commission has acted arbitrarily in fixing the rate of return.

The order of the Commission provides:

> "Hereafter, when a local service area, city or town, moves into another group by reason of the change in its number of stations, the telephone company may put into effect the rates applicable to the Class Rate of said group by filing with the Commission a tariff, together with an affidavit setting forth the number of stations in such local service area, city or town."

The patrons register emphatic disapproval of this provision on the ground that it disregards: (1) the fundamental proposition that rates are to be founded upon the fair value of the Utility's property used and useful in the public service; and (2) the rule established by the statute (Code, Chapter 15-O, Sec. 9) that changes in rates shall be upon full hearing before the Commission, at which hearing the applicant shall carry the burden of proof. The Commission certainly cannot by such order prevent the patrons in the future from protesting against, or estop itself from investigating, any proposed reclassification.

We are of opinion to modify the order of the Commission in this particular, and affirm it in all other respects.

*Modified and affirmed.*

WOODS, JUDGE: *(Concurring in part; dissenting in part.)*

I concur in the opinion of the Court regarding the value of the physical property, going value, working capital and automatic grouping of exchanges. I also agree with the Court that the Interstate Commerce Commission has not excluded the jurisdiction of the state commission over the rate of depreciation charges. However, I do not feel that I can go to the extent of affirming the commission on the rate fixed here to cover depreciation and the accrual thereby of the

depreciation reserve. The commission was divided on this finding.

When an inventory of the property of a public utility is made for any purpose, the various parts of the plant in use will be found not to be in the same condition as they were when new. This change begins to take place from the moment of installation, and is due, when for the worse, to what has been called "depreciation." How this changing condition of the property should be taken care of in public utility business has proved to be a very perplexing question. The loss or lessening in value is due to a great many causes, a few of which are use, wear and tear, storms and obsolescence. Not many years ago the idea that any provision should be made for depreciation of the part of the cost of utility service was deemed unsound in some quarters. That an allowance must be made to establish a depreciation fund is now generally admitted by courts and commissions. There are different methods of arriving at depreciation, such as the inspection method, sinking fund method, straight line method, theoretical method, and the like. The decisions only lay down the rule that allowance for depreciation is proper to utilities, but this only as a general proposition and the amount of such allowance depends usually upon the character of the utility. Experience has shown that utilities are generally built in such temporary fashion as will require approximately the per centum allowed in this case for replacements and to provide against casualties. But this cannot be true of the Chesapeake & Potomac Telephone Company, which builds in a more permanent fashion and where experience has shown that its needs do not require the amount of other utilities of less permanent character. Judge LITZ pays a deserved tribute in his opinion to this utility's unique financial and managerial resources. Our Public Service Commission, in *C. H. Mead Coal Co.* v. *Appalachian Power Co.*, P. U. R. 1923 E, 221, declared: "If a plant is highly maintained, the amount set aside each year in its reserve fund need not be so large as the amount would be if the plant was not so efficiently maintained." *In Re New York Telephone Company*, P. U. R. 1925 C, 767, the New Jersey Public Utility Commissioners held that no better guide

as to reasonable amount of depreciation rate can be found than the experience of the utility company. Let us apply this rule to the instant case.

Going back seven years, we see from the Jirgal exhibit No. 1, that including large amounts for dismantling duplicate property, only in one year (1918) did the accrued depreciation exceed the sum of $550,000.00 allowed by the commission in the instant case. In no year after eliminating dismantlements has the net depreciation charges come within $85,000.00 of the sum allowed by the commission. In other words, according to the evidence, the largest amount charged to depreciation since 1917, was $465,000.00, whereas the commission now allows $550,000.00. The company has collected from the rate payers during these seven years $1,306,043.00 more than the company actually needed for its depreciation requirements on property in use in the public service. This reserve at the end of 1923 was $1,891,314.02.

An examination of the evidence before the commission discloses what a large part of the utility's operating expenses consist of depreciation charges and what it means to the rate payer to contribute to the accrual of this depreciation reserve. Why the allowance of the large depreciation reserve asked for by the utility? The burden is upon it to show the facts demanding it. *Pacific Gas Company* v. *City of San Francisco*, 265 U. S. 403. Justice Reynolds in that case said: "The problem was to ascertain the probable result of the specified rate if applied under well known passed conditions; not to forecast the probable outcome on a proposed rate under future conditions." The record of the utility as to actual depreciation for the past seven years is potential evidence when invoked by the telephone users on this question. *Re Lebanon Telephone Company* (Ind.), P. U. R. 1925 B, 225. These facts are met only by calculations based upon theories and presumptions. Actual experience outweighs mere conjecture.

Not only do the patrons contend that the fact that there is a depreciation reserve at the present time of approximately Two Million Dollars, be taken into consideration by the commission in fixing the annual rate allowed for depreciation,

but that the reserve should be interest bearing. It is contended that the consumer by his contribution to the depreciation through the rate paid for services is, in effect, contributing to the construction of the plant the same as the stockholder or bondholder—at least that this is true to the extent that depreciation is provided in excess of the company's immediate requirements. Counsel for the utility in their brief take the view that the depreciation accruals are operating expenses—not in part, but in whole; that the purpose of the payments made by the customers to provide a reserve are not only for the purpose of protecting the company against retirement losses, when realized, but that such payments are also intended to protect the company against an actual depreciation or shrinkage of value of its property, during its period of use and prior to its retirement; and that actual depreciation of the value of the property follows a "straight line". They insist the company has, in the past, followed the "straight line" method for accruals for depreciation because this represents the simplest and fairest and most accurate way of equitably distributing throughout the life of the property this item of expense. Under this method amounts are set aside annually which, without the interest accruals thereto or unaided by the earnings of the unexpended balances in such fund, will replace the depreciable property at the end of its useful life. The courts, however, do not seem to hold that public utility property really depreciates in such degree. *Consolidated Gas Co.* v. *Newton*, 267 Fed. 265. The past experience of the utility, as we have seen, likewise shows the latter to be true. However, the utility here contends that the depreciation percentages shall be ascertained by considering the estimated not useful but service life of each unit of property and the salvage value connected therewith. This being so, it follows that the reserve that would be accumulated even on a "straight line" basis, as here would be in excess of the accrued depreciation. The Wisconsin Railroad Commission in *Re Wisconsin Telephone Co.*, P. U. R. 1925 D, 671, in discussing this question, said: "To the extent that the accumulated reserve is in excess of true depreciation, its only purpose is to serve as an advance provision against losses realized when

retirements occur. Between the date of the payment of such excess by customers and the actual retirement, such excess serves the purpose of the company as available capital. * * * To the extent that the reserve may be used in excess of actual depreciation, it can only represent advance provision of capital to meet a loss to occur later, and fairness to those that have made that advance provision requires that they be given the benefit of the use of such capital." Following this reasoning the commission there held that: "The computation of depreciation on the so-called 'straight line' method which gives no consideration to the interest which the reserve fund would earn, is unfair to the customer if return is to be allowed on the undepreciated value of the property." Spurr, in his comprehensive work on public service regulation, says, "The decision in this case is undoubtedly sound." 2 Spurr, 334. Thus we see, from the standpoint most favorable to the utility, the patrons' claim for an interest-bearing reserve is supported. Under the sinking fund method, only such amounts are set aside annually as, with the interest accruals thereto, will replace the depreciable property at the end of its useful life. 2 Spurr, Public Service Regulation, 342, says: "The sinking fund method, since it relies upon the accumulation of interest to make up the amount required to replace depreciable property, demands a much smaller annual depreciation fund than the straight line method, especially when the property is of a comparatively long life." The protestants here advocate a modified form of this method—that the charges be loaned to the utility for use in its business and that the fund so loaned receive credit for interest at four per centum. Our commission has recognized that a prudent investment theory should be applied to the depreciation charges and accruals. In C. H. Mead Coal Company v. Appalachian Power Company, supra, the commission, in its opinion, declared: "This fund should be kept under a separate account and the annual contribution to the fund should be invested by the utility so that it would earn a reasonable income each year and the income should be charged to the account so that the account would be accumulative to meet the necessary replacement charges." The utility in the instant case in its

computation for depreciation has used the "straight line" method which gives no consideration to the interest which a reserve fund would earn. The accrued reserve was accumulated by means of this method (at least since the consolidation). Its application would permit the utility to earn a return on the depreciation funds provided by the customers during the life of the property and which are not needed for the purpose for which they are provided until the property is retired. The return could be earned by the utility by either placing the fund at interest in some safe investment or by investing it in extensions to its property. This is, in effect, the plan urged by the protestants. It follows· that such action would reduce the depreciation charge against the telephone users—likewise the rates. In determining the proper allowance for depreciation it must be borne in mind that regulation has come into being for the purpose of establishing an equitable relation between the consumers and the utility. If the value of the property is to be determined by rules laid down by the courts, the provision for depreciation must take into consideration some measure of equity which is consistent with the value already established, and it would appear that the only way consideration could be given to this element is in the recognition that the depreciation reserve built up by the utility is reinvested in its property, and is, therefore, entitled to an interest earning, as claimed by the protestants. This is at least true to the extent that depreciation is provided in excess of the utility's immediate requirements. The Oregon Public Service Commission in *Re Pacific Telephone & Telegraph Co.*, P. U. R. 1924 D, 39, in discussing how the swollen depreciation reserve should be handled said that the order on the hearing for increase of rates should have contained a provision that would have prevented the company from including in the operating expenses any sum for depreciation until said excess should be eliminated. "If this were done", says the commission, "a further cut in rates could be made  *  *  * thus further relieving the rate payers." We are not unmindful that counsel for the utility claim it is a mere bookkeeping entry. The depreciation reserve is something more than a mere book entry. The utility, under public regulation, asking

for and receiving a return for the purpose of establishing a reserve fund, has received from the rate-payers a fund, the commission was bound to grant, and a correlative duty rests upon the utility to employ the fund for the purpose it was asked for and received, and for none other. It was impressed with the purpose of maintaining the rate base and amortizing the investment, and cannot be employed to increase the rate base. The utility may not even spend the fund for betterments. *Railroad Commission* v. *Cumberland Teleph. & Teleg. Co.*, 212 U. S. 414; 53 L. ed. 577. In *Home Telephone Co.* v. *Town of Carthage,* 235 Mo. 644, the court, in speaking of the inconsistency of the theory of an accumulation of an excessive fund where the plant was valued without any deduction for the amount on hand in such fund, said: "It is obvious that upon that theory a time would be reached when the depreciation fund would amount to almost the total value of the plant, and yet, in determining the reasonableness of the rates, the plant, which theoretically would be the victim of almost complete 'invisible rot', would be valued as new in determining the reasonable value of the property at the time it was used by the public, while no corresponding credit would be given for the depreciation fund on hand." This line of reasoning has force here. Here we have a reserve fund of approximately fourteen per centum of the entire capital invested by the utility in the public service. It is being added to year by year without any account being taken of the interest feature. It serves, in effect, as we have seen, to increase the rate base. This Court, in *Huntington* v. *Public Service Commission,* 89 W. Va. 703, said: "A schedule of rates for public utility that effects inequitable results is and always has been the subject of judicial inquiry, whatever may be the source of the authority prescribing such rates." The subject of rate making should be approached by commissions and courts with a view of doing what is fair and just between the parties under all the circumstances of the particular case. *Roanoke W. W. Co.* v. *Commission,* 137 Va. 348. What is a reasonable return is a judicial problem. *Waukesha Gas & Elec. Co.* v. *Railroad Commission,* 181 Wis. 281. Our statute (Code, Ch. 15-O, § 9) casts the burden on the utility of showing an increase is

just and reasonable. Chairman Stathers, in his dissenting opinion, in the instant case, P. U. R. 1925 C, 587, took the utility's figures, and fixed an average sum for the last four years for depreciation (which I believe to be a fair sum), and upon the rate base fixed by the commission, which he says is too high, shows the utility is earning six and nine-tenths per centum, including Federal income tax. The utility wanted eight per centum. The commission gave it seven per centum. Earnings of six per centum as to utilities have been upheld by the Supreme Court of the United States. *Willcox* v. *Gas Company*, 212 U. S. 19; *Cedar Rapids Gas-light Co.* v. *Cedar Rapids*, 223 U. S. 655; *Des Moines Gas Co.* v. *Des Moines*, 238 U. S. 153; *Dayton-Gooscreek Ry. Co.* v. *U. S.*, 263 U. S. 456. In the light of the indubitable facts in the case here—the steadily increasing reserve—should the rates be increased to secure the negligible difference of one-tenth of one per centum? To me a just balancing of the equities as between the utility on the one hand and its patrons on the other does not require this. "If either is to be protected to the disadvantage of the other, the utility must bear the consequences." *Huntington* v. *Public Service Commission, supra.* Judge POFFENBARGER, speaking for this Court, in *Baltimore & Ohio R. R. Co.* v. *Public Service Commission*, 81 W. Va. 457, says: "Where the facts are undisputed, and the reason and justice of the case is clear and plain, an order made in contravention thereof has no foundation in law, and is not beyond the power of judicial abrogation." Including the allowance of the commission for the item of intangibles, to which ruling I do not subscribe (See, *Re Lebanon Telephone Co.*, P. U. R. 1925 B, 114; *Moritz* v. *Edison Electric Co.*, P. U. R. 1917 A, 396-398; *Wilcox* v. *Consolidated Gas Co.*, *supra*), it would seem that the utility will receive a fair return. However, the elimination of this item from the rate base, leaving all other rulings of the commission without change, would give to the utility seven and eight hundredths per centum return. Holding these views, I would suspend the order increasing rates and remand the case to the Commission.