# CHARLESTON.

HUNTINGTON DEVELOPMENT & GAS COMPANY *v.* PUBLIC
SERVICE COMMISSION

(No. 6239)

Submitted May 2, 1928.        Decided May 19, 1928.

GAS—*Gas Company's Supplemental Contract, Requiring Distribut-
    ing Company to Bear Loss in Leakage Until it Keeps Lines
    in Repair, Held Not Discrimination Against Individual Con-
    sumers; in Proceeding Not Involving Discrimination, Ade-
    equate Supply, or Rates, Public Service Commission May
    Not Disregard Supplemental Contract Requiring Distribut-
    ing Company to Bear Loss From Gas Leakage Until it
    Repairs Line (Code, c. 15-O, § 23).*

A supplemental contract between a gas company and a dis-
tributing company obligating the latter to bear the loss in
gas leakage upon its lines until compliance is had with a
term of the original contract requiring the distributing com-
pany to keep and maintain its line in a proper state of repair,
is not invalid as being a discrimination between individual
consumers supplied by the gas company, and the Public
Service Commission is without authority to enter an order
disregarding it in a proceeding before it which does not in-
volve discrimination, adequate supply, or rates as between
the consumers.

(Gas, 28 C. J. §§ 21, 24.)

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not
    part of syllabi.)

MILLER, PRESIDENT, absent.

Appeal from Public Service Commission.

Proceeding by W. M. Topping and another intervening be-
fore the Public Service Commission to require the Huntington
Development & Gas Company to take over and maintain cer-
tain gas line extensions. From an order of the Public Service
Commission, the Huntington Development & Gas Company
appeals.

*Reversed in part; affirmed in part; remanded.*

*W. C. W. Renshaw,* for appellant.

*J. W. Fitchett,* for respondent Topping.

*F. M. Livezey,* for respondent Public Service Commission.

LIVELY, JUDGE:

The Huntington Development & Gas Company (hereinafter referred to as the defendant Gas Company), obtained this appeal from an order of the Public Service Commission entered in case No. 1804, wherein W. M. Topping and W. W. Ridenour (intervenor) as complainants sought to require the Gas Company to take over and maintain certain gas line extensions in Cabell county.

In 1920, complainant Topping and seven of his neighbors residing about five miles from the City of Huntington formed an organization which they called the Four Pole Gas Company (the name adopted being that of a creek in that vicinity), and entered into a verbal agreement with the defendant Gas Company to furnish them gas for domestic purposes. At a cost of $2500.00 they constructed a two-inch extension about a mile and a half in length, under the direction of the Gas Company, which was connected to its twelve-inch high pressure main running through this section from Branchland, Lincoln county to Huntington. Under this agreement, the duty of maintaining and repairing the extension rested upon the Four Pole Gas Company, while the defendant Gas Company was required to install and read all meters and collect the gas bills from each consumer. Not long after this arrangement had been made, complainant Ridenour and nine other individuals living on Sixteenth Street beyond the Four Pole Gas Company's line, formed the Sixteenth Street Gas Company and at their own expense constructed a further extension of one and a half miles, and for the sum of $800.00 secured the privilege of tapping the Four Pole Gas Company's main. They also paid to that company $50.00 for every person tapping the Sixteenth Street line. Each company charged the individual consumers a fixed fee for the privilege of attaching to its respective main. The sums so collected were used to reimburse the founders of the two organizations for their initial outlay, to repair and maintain

the gas lines, and to assist certain consumers in installing service lines of exceptional length. In the beginning, defendant Gas Company put in and read the meters, and collected the bills of individual consumers on both of these extensions.

This situation continued until 1924, when the defendant Gas Company changed hands, and the new owner conceiving that a large amount of gas was lost through leakage on rural lines of this character, and especially on the two extensions in question by reason of their being out of repair, consulted with representatives of the Four Pole Gas Company as to the feasibility of continuing to furnish gas under the existing conditions. Numerous conferences were held, as a result of which, on December 23, 1924, a written agreement was entered into between defendant and W. M. Topping of the Four Pole Gas Company, under the terms of which the latter company agreed to pay $100.00 for the installation of a master meter on its pipe line then connected to the Gas Company's two twelve-inch mains. It was further provided therein, "that the Four Pole Gas Company upon presentation of the monthly bills will pay to the Huntington Development & Gas Company a sum equal to the difference between the consumption of gas as registered on the master meter less the sum total of the consumption of gas of all the consumers' meters attached to said Orchard Grove line, at the regular standard rate per thousand cubic feet of the Huntington Development & Gas Company. This arrangement is to continue until the pipe line is properly repaired and placed in an efficient operative condition as approved by the representative of the Huntington Development & Gas Company, and said line to be repaired as understood is the one between the point where the Orchard Grove line taps on the main line of the Huntington Development & Gas Company, and the houses of each and every consumer referred to. It is further understood and agreed upon in any event, that the master meter is not to be disconnected and the arrangement agreed upon herein discontinued until after July 1, 1925, and then only if you have complied with the provisions outlined herein." After the installation of the master meter whenever a consumer moved out of a residence,

the Gas Company took out the meter and the new tenant or occupant was required to install another at his own expense. Because of the Gas Company's refusal to read such meter, that duty involved upon plaintiff Topping, representing the plaintiff Four Pole Gas Company. This practice was continued on both the Four Pole Gas Company and the Sixteenth Street Gas Company's lines until finally the defendant Gas Company was reading the meters and collecting gas bills from twenty-nine consumers, while Topping representing the Four Pole Gas Company, was held responsible for the gas delivered to twenty consumers and all the leakage, he being charged with the difference between the reading of the master meter and the sum total of the readings of the twenty-nine meters owned and read by the Gas Company. The difference between the amount charged Topping by the Gas Company and the amount he collected from the twenty persons whose meters he read, was paid by the original members of the Four Pole Gas Company, and was not proportioned among the other consumers in any way. A master meter was installed by the Four Pole Gas Company at the point where its line connected with that of the Sixteenth Street Gas Company, but as yet it has not been put in use.

In September 1927, the Four Pole Gas Company by W. M. Topping, and the Sixteenth Street Gas Company by Duncan W. Daugherty, joined in an offer to turn over without charge to the Huntington Development & Gas Company, their extension lines and rights of way therefor, in consideration of the Gas Company's maintaining and repairing such lines, furnishing an adequate supply of gas, and reading the meters and collecting all gas bills therefor. The Gas Company declined this offer. At a later date, this present proceeding was instituted by the complainant Topping asking that the Gas Company be required to take over and maintain the extension line, in order that he might be relieved of the contract mentioned above. Complainant Ridenour intervened, asserting that should a consumer on the Sixteenth Street line whose meter is read by W. M. Topping refuse to pay for gas used through said meter, he, Ridenour, would be held responsible, and therefore he sought similar relief.

, It further appears from the testimony offered on behalf of the Gas Company, before the Public Service Commission, that the complainant's gas lines were in a bad state of repair, and the conditions under which the service was rendered made it necessary that new lines be constructed, both because of the inadequacy of the present ones and their present state of deterioration. The cost of such new lines was estimated to be $19,000.00. On the other hand, the Commission's engineers reported that the extension lines were in a fair state of repair comparable to non-standard lines in other like sections of the State. However, they recommended that the individual meters on the complainants' service lines should be moved to a point where the service lines connect with the complainants' main line. The Commission's engineers were further of the opinion that the meters could be so moved and the gas lines completely rehabilitated by the expenditure of $750.00.

After hearing the evidence introduced in the case and the arguments of counsel, the Public Service Commission held that at the time the complainants and their associates had attached their extension to the Gas Company's lines, it was then and is now the duty of the Gas Company, a public service corporation, to supply gas to these persons so making their connections, and to furnish and maintain in good order meters to measure the gas so supplied, and to collect a reasonable compensation therefor; that this duty could not lawfully be changed, modified or impaired by any contract made between the defendant public service corporation and any other person; that the service now being rendered by the defendant to the persons whose lines are connected with those of the Four Pole Gas Company and the Sixteenth Street Company is not sufficient, because, "(a) the defendant has failed to provide and maintain meters to measure the gas supply to about twenty consumers, and (b) the defendant (by its agent or by any other contractor or agent), has failed to read the meters and collect charges for gas delivered to certain about twenty consumers, and (c) certain of said consumers are being charged for the quantity of gas consumed by them, and (d) none of the said consumers (except the complainant Topping),

is being charged with any sum for a share or portion of the quantity of gas that is being lost by way of leakage in the lines constructed by them and to which their service lines are attached, all the leakage being charged to said complainant''; that said practices are discriminatory and preferential as among the consumers on said line. The Commission therefore ordered that the Huntington Development & Gas Company be required to furnish gas to all the persons desiring the same who now or hereafter may have service lines attached to the lines of the Four Pole Gas Company and the Sixteenth Street Gas Company; that the Gas Company should install meters at the point on the service lines recommended by the Commission's engineers; that the defendant should read the individual meters and the master meter monthly (both to be read on the same day); and that, ''The rate shall be the rate charged for like service in the City of Huntington, except that there shall be added to each consumer's monthly bill a charge for leakage in proportion to his consumption of gas, which said charge shall be ascertained in the following manner: The entire quantity of gas delivered into the line of the Four Pole Gas Company shall be measured by the master meter at the point of junction with the defendant's line at an average pressure for the preceding month, which pressure shall be sufficient to deliver gas to said consumers at a pressure of eight (8) ounces; the difference between ninety per cent. (90%) of the quantity so ascertained and the aggregate amount of gas delivered to consumers as ascertained by reading the consumers' meters shall be deemed the leakage apportioned to the bills of said consumers.'' This order was to continue in effect six months after March 1, 1928, until otherwise ordered by the Commission, and the defendant on April 10, 1928, and monthly thereafter for six months, was required to file with the Commission a statement showing the data relating to the leakage of gas. Jurisdiction of the cause was retained to receive said reports and to make such further order as the Commission might deem proper.

We are met at the outset of this case by a motion to dismiss the appeal as improvidently awarded because the Commis-

sion's order is not final. We are not disposed to dwell at length upon this motion. The order, while provisional in some respects, is final in that it determines the real matter in controversy, namely, the validity of the contract made on December 23, 1924.

The controlling question presented is whether the written contract of December 23, 1924, entered into between the complainant Topping, representing the Four Pole Gas Company, and the defendant Gas Company, was an encroachment upon the Commission's power to regulate the service furnished by the former to its consumers. It is apparent that by reason of its declared policy as evidenced by tariffs published, the extent to which, and the manner in which, it has supplied gas in this community, the Gas Company was in 1924 and is now under a duty to provide service to the forty-nine or more consumers on the Four Pole and the Sixteenth Street extension lines. Consequently, it is in respect to that service subject to the Commission's power of regulation, which, in the exercise thereof may disregard any contract deemed to be at variance with the needs of the service as determind by it, or which is discriminatory in character. Vol. 1, Spurr on Guiding Principles of Public Service Regulation, pages 111, 112; sec. 23, chapter 15-O of the Code.

But is this contract at variance with the needs of the service, or is it discriminatory in character? We are inclined to believe not. Under the original agreement entered into in 1920, the Four Pole Gas Company (by this designation we refer to Topping and his seven associates—the consumers subsequently tapping its lines did not become members of the Company), agreed to build, maintain and keep in repair its extension line. And it was, under the circumstances, but reasonable for the Gas Company to require that this should be done. From time to time, the Four Pole Gas Company allowed various individuals to tap its mains, charging each of them a fixed sum. This money went to the members of the Four Pole Gas Company who used it in reimbursing themselves for their initial expenditure in the building of the Company's lines, to maintain and repair the same, and in

assisting consumers who were required to build service lines of unusual length. The Four Pole Gas Company likewise charged the Sixteenth Street Gas Company $800.00 for tapping its main and received $50.00 for each individual tapping on the Sixteenth Street Company's extension. This duty of maintenance and repair of its line rested upon the members of the Company alone, and their whole course of action indicates that they recognized this responsibility. Likewise, as between the Four Pole Gas Company and the defendant Gas Company, the former was under a duty to see that the Sixteenth Street Gas Company kept its line in repair. Topping and his associates received the fees paid to the Four Pole Gas Company and used them as they saw fit. They also apportioned among themselves the sums due for gas leakage which the Four Pole Gas Company was required to pay. (It is not necessary in this proceeding to determine the extent to which the Four Pole Gas Company can require the other consumers on its line and the Sixteenth Street line to share this leakage loss.) The Gas Company dealt with the Four Pole Gas Company, and not with the individual consumers who may have tapped the Four Pole Gas Company's line, or that of the Sixteenth Street Gas Company. The agreement of December 23, 1924, was between the same parties as the original contract of 1920 or 1921, was supplemental thereto, and served as a means of carrying out one of its provisions, namely, that the Four Pole Gas Company should maintain and keep in repair its extension line. It merely fixed the obligation which the Four Pole Gas Company would incur for not maintaining its line in a proper state of repair, which obligation was to end upon the satisfactory reconditioning of the extension. Thus it is apparent that this contract was not an attempt to discriminate between the individual consumers on the Four Pole Gas Company's line, nor to interfere with the Commission's power to regulate the service furnished.

The evidence discloses that after this subsequent contract was entered into, the Gas Company adopted a policy of refusing to install meters or to read them. Such action was not warranted by the contract of 1924 and was in violation of the prior (1920) agreement between the parties. It is the

contention of the Gas Company, as brought out by cross-examination of the complainant's witnesses, that whatever duty the Gas Company may have been under in that regard was waived by the Four Pole Gas Company through its acquiescence in the failure to perform that service. But, be that as it may, regardless of the contract between the parties, as the Gas Company in furnishing this service comes under the regulation of the Public Service Commission, that body may, not as enforcing specific performance of the contract, but as a reasonable regulation, require the Gas Company to install and read the meters as set out in its order. *Re Paw-huska Oil & Gas Company,* (Okla.) P. U. R. 1917D 947; *City of Redding* v. *Northern Cal. Power Company,* P. U. R. 1916F 803; *Wood* v. *La Farge,* (Wis.) P. U. R. 1917A 763.

Even if we were disposed to agree with the Commission that the contract of December 1924 was invalid as being discriminatory in character, yet the Commission's order would be erroneous in this—it is not apparent from the record that there was any evidence upon which the Commission was warranted in fixing the arbitrary ten per cent. loss in gas leakage to be borne by the Gas Company. The Commission says that from its experience in public service matters it believes such a deduction was proper, and that this probable loss in leakage was taken into consideration in fixing the rate charged. But the Commission's belief drawn from its fund of experience is not evidence, and an order of the Public Service Commission which is without evidence to support it cannot be upheld by this Court. *Huntington* v. *Public Service Commission,* 101 W. Va. 378.

It may be well to note in passing that there has been no complaint by any of the consumers as to the adequacy of the service furnished, and so we have not been concerned with that question on this appeal.

The order of the Public Service Commission will be reversed in part and affirmed in part, as above indicated.

*Reversed in part; affirmed in part; remanded.*